**MAX DAETWYLER CORP. and MDC
Max Daetwyler, A.G.,**

v.

**INPUT GRAPHICS, INC. and
Benton Graphics, Inc.**

Civ. A. No. 81–1140.

United States District Court,
E. D. Pennsylvania.

July 7, 1982.

Manny Pokotilow, Philadelphia, Pa., for plaintiffs.

Peter Cobrin, New York City, Robert Podwil, Philadelphia, Pa., for defendants.

## MEMORANDUM

### LOUIS H. POLLAK, District Judge.

Plaintiffs have brought this action asserting two causes of action: count one of their amended complaint alleges that defendants are infringing plaintiffs' patent for "doctor blades"—a blade-shaped device for wiping excess ink from the printing surface used in photogravure printing techniques—by manufacturing and selling a similar device; and count two asserts that the defendants falsely represented the characteristics of their doctor blade device in violation of Section 43(a) of the Lanham-Trademark Act, 15 U.S.C. § 1125(a). Defendants have now moved for summary judgment on both counts.

The doctor blade device was invented by Max Widmer, a Swiss citizen, who assigned the patent rights to plaintiff, MDC Max Daetwyler, A.G., a Swiss corporation ("Daetwyler Swiss"). The other plaintiff, Max Daetwyler Corporation ("Daetwyler U.S. A."), is a New York corporation managed by Peter Daetwyler. Daetwyler U.S.A. is the exclusive licensee of the Daetwyler doctor blade and is responsible for its sale and distribution in the United States.

Defendants are Benton Graphics, a New Jersey corporation, and Input Graphics, a Pennsylvania corporation. Benton Graphics manufactures the Benton blade—the device accused by plaintiffs of infringing the patented Daetwyler blade—and Input Graphics is the sole distributor of the Benton blade. The Benton blade is not protected by any patent.

In order to appreciate the legal issues presented, the technology of photogravure printing and the role played by doctor blades in that art must be understood in some detail. In the photogravure printing process, the image or text to be printed is first cut or etched into the printing surface of a cylindrical roller. This forms ink-retaining grooves on the printing surface of the roller. Before a printing impression is made, the engraved printing surface is inked and a doctor blade is used to remove excess ink from the roller printing surface. In general, the blade is a long, thin strip of metal mounted so that its edge will run very close to the surface of the cylinder. As the printing cylinder rotates and the surface is inked, the doctor blade wipes off the excess and the surface is then impressed on the paper to make a print.

In the past, printers complained that conventionally designed doctor blades wore out quickly, producing streaking and unsatisfactory quality in printing runs. The Daetwyler blade was an attempt to improve the situation by designing a longer-lasting blade which would maintain satisfactory print quality over longer printing runs without the need for frequent blade replacements. In the Daetwyler design, the running edge, or contact surface, is beveled and the forward section of the blade is ground to a substantially constant thickness. Because of this design, the blade retains a constant running edge along the printing surface of the rotating cylinder. As the blade is worn down, it is advanced toward the cylinder surface to keep the running edge close to the printing surface. In this way, the blade may be used until the entire length of the reduced thickness section is worn down, thereby increasing the useful life of the blade.

The design of the Benton blade—the device accused of infringing upon plaintiffs' patent—is similar to the Daetwyler design. In the Benton blade, instead of maintaining, as in the Daetwyler blade, a substantially constant thickness throughout the forward section of the blade, the forward section flares in an increasing taper back from the running edge. Thus, in the Daetwyler design, when the blade is viewed from the side, the top and bottom surfaces of the forward section appear to be substantially parallel; whereas, in the Benton design, when the blade is viewed from the same perspective, the bottom surface remains constant but the top surface slants at an upward angle from the running edge toward the back of the blade. The gist of the dispute between the parties turns on the legal significance of this difference between the patented parallel Daetwyler design and the tapered design alleged by defendants to be distinct from the patented blade.

## I.

■ Plaintiffs' patent infringement claim is bottomed on the doctrine of equiva-

lents. Under this theory, a patent holder need not show that the accused device infringes directly on his patent; instead, it is sufficient that he show that the accused device "performs substantially the same function in substantially the same way to obtain the same result" as the patented device, even though the assertedly infringing device departs in minor details from the express claims of the patent. *Graver Tank Co. v. Linde Air Prod. Co.,* 339 U.S. 605, 607–08, 70 S.Ct. 854, 855–56, 94 L.Ed. 1097 (1950). This doctrine serves to protect the patentee from clever copyists who make unimportant or insubstantial substitutions or modifications solely to avoid the scope of the patent. In plaintiffs' view, the Benton blade performs the same function (removing excess ink), using substantially the same technique (a thin, beveled blade), to achieve the same result (preparing the engraved cylinder surface for printing) and, therefore, the Benton blade is guilty of infringement under the principles established in *Graver Tank, supra.*

■ While conceding that the Benton blade might be found liable under the doctrine of equivalents, defendants contend that a complementary principle of patent law—the file wrapper estoppel doctrine—bars plaintiffs from invoking the equivalents theory in this case. In essence, the file wrapper estoppel doctrine prevents a patentee from relying upon the equivalents principle if he has abandoned or redrafted more narrowly a claim, which was contained in an initial, rejected patent application, in order to avoid a further rejection by the patent examiner on the basis of prior art. Thus, a patent holder may not broaden his patent claims by resort to the doctrine of equivalents in order to recapture claims which he had relinquished during the prosecution of his patent application. As the Third Circuit has explained: "By redrafting or abandoning a claim in the face of a prior art rejection, the patentee is conceding that he has not invented what he thereby disclaims and therefore will not be heard to assert, at a later date, what he disclaimed as his invention." *Trio Process Corp. v. L.*

*Goldstein's Sons, Inc.*, 461 F.2d 66, 75 (3d Cir. 1972). *See also John L. Rie, Inc. v. Shelly Bros., Inc.*, 366 F.Supp. 84, 88 (E.D. Pa.1973).

Specifically, defendants contend that the "file wrapper"—i.e. the documentary history of the prosecution of plaintiffs' patent—reveals that after plaintiffs' first application was rejected, plaintiffs deleted their initial, tapered-blade design and substituted a more restrictive parallel design. Since plaintiffs gave up their claims to a tapered blade before the Patent Office, defendants reason that plaintiffs cannot now assert that defendants' tapered design infringes upon plaintiffs' patent.

To appreciate defendants' contentions, a brief review of the file wrapper history is necessary. Plaintiffs' first application, Serial No. 329,070, filed in 1972 and amended in 1973, contained a Claim 1 which stated that the forward section of the blade was "configured so as to maintain essentially constant the size of the contact surface." This application also contained a Claim 3 which described the device defined in Claim 1 as a blade "wherein [the] surfaces taper in a wedge-like manner with respect to one another and enclose an angle which does not exceed 5°." The Patent Office rejected the application. In his report, the examiner noted that Claim 3 was unpatentable, citing previous patents by Lundbye, Owren, Maschinenfabrik, Nuttal and Durham, and explained specifically that "the blades in each of the primary references could obviously be of a tapered configuration such as taught by Durham." Final Rejection Notice Re: Serial No. 329,070 (May 11, 1974) (J. Reed Fisher, Examiner). Rather than appealing this rejection, plaintiffs filed a continuation-in-part application, Serial No. 514,485, in October 1974. In this application, the original Claim 3 was dropped and Claim 1 was modified to describe a blade with "two generally parallel" surfaces. After further rejections and amended applications, a patent was ultimately allowed in 1979 and issued on January 22, 1980. This patent derived from plaintiffs' final revised application, Serial No. 653,429, which set forth in Claim 22 a description of a doctor blade with a "constant blade thickness between two (2) mutually parallel blade surfaces."

For defendants, the crucial event in this file wrapper history is the deletion by plaintiffs of the tapered design of the first, rejected Claim 3 and the use of a parallel-design description in all subsequent applications. They argue that this constituted a narrowing of plaintiffs' claims and that therefore plaintiffs are estopped from claiming protection from infringement based on broader claims to taper that were abandoned during the prosecution of plaintiffs' patent application.

In response, plaintiffs contend principally that defendants are not entitled to summary judgment because the question whether the Benton blade follows design specifications—such as a taper—which were given up by plaintiffs in order to obtain their patent raises genuine issues of material fact. In particular, plaintiffs stress that the taper in the Benton blade is not an intended design feature but rather an artifact caused by the limitations of the chemical etching process used by defendants to manufacture the Benton blade. In plaintiffs' view, the Benton blade cannot be seen as a modification of the Daetwyler blade distinctly based on a tapered design which was derived from prior art, but must instead be recognized as only an artifactual variation from the exact parallelism of the Daetwyler design. Moreover, plaintiffs insist that the alleged Benton taper, regardless of its basis, is clearly embraced by the terms of plaintiffs' patent which provides for a range of mechanical tolerances from exact parallelism. Since, in plaintiffs' view, such mechanical variations from precise parallelism are accounted for in their patent claims, the specifications of defendants' device are embraced by the Daetwyler patent. Therefore, the file wrapper estoppel doctrine does not rescue defendants from a claim of infringement.

The proper application of the file wrapper estoppel doctrine to the facts of this case presents issues which are not easy to

resolve. And while the question is a close one, it is nevertheless apparent that plaintiffs face a high hurdle which may be difficult to clear. This difficulty arises in large measure from the strictures of the file wrapper estoppel doctrine and also from the general willingness of courts to parse patent claims very closely when an inventor alleges infringement by a device which contains features abandoned by the inventor during the prosecution of his patent. In a case closely comparable to this one, the Ninth Circuit considered an infringement claim brought by the holder of a patent for a coupling device used in connecting spiralled, flexible conduits to electrical junction boxes. *D. & H. Electric Co. v. M. Stephens Mfg.*, 233 F.2d 879 (9th Cir. 1956). In response to a Patent Office rejection based on prior art, the inventor had stressed that the connecting ribs of his device were not arranged in convolutions as in the screw-thread connectors disclosed by prior art but were instead placed at right angles, thus establishing a novel method of connecting conduits to junction boxes. *Id.* at 883. The court noted preliminarily that:

> [T]he basic and almost the only difference between the device (the subject of the patent in suit), which is alleged to infringe upon the patent device, is the placement of the ribs. The ribs of appellants' device are placed at 90° to the major axis, or straight across the projecting tube, while the ribs of appellees' device vary from 85° to 89° from the major axis according to the fineness of the thread.

It is apparent that appellants' major contention is that the Trial Court erred in failing to find that the ribs on appellees' coupling, although one to five degrees off the perpendicular, were "substantially" at right angles to the major axis and thus within the claim of the patent in suit. As already stated, the Trial Court found, and we think not erroneously, that the patent in suit was limited to ribs at right angles to the major axis, and that the word "substantially" was used only to indicate any tolerance as great as, but not exceeding the practical minimum in the manufacture of the device.

*Id.* at 882. In concluding that the infringement claim was defeated by file wrapper estoppel, the Court observed:

> Having asserted the novelty of the right angle principle in order to secure the patent, appellant cannot now expand his coverage to include other claims which were denied him in the proceedings before the patent office. This is simply the exercise of the doctrine of "file wrapper estoppel"—the gravamen of which is that an applicant who acquiesces in the rejection of his claim, and accordingly modifies it to secure its allowance, will not subsequently be allowed to expand his claim by interpretation to include the principles originally rejected or their equivalents....
>
> This case is complicated by the striking similarity of the patent in suit and the appellees' device, much of which of course is dictated by the limited function performed by the devices. Shape and dimensions are substantially, if not exactly, the same, the sole difference being that the angle of the ribs of appellants' device is 90° to the major axis, while the projections of the appellees' device vary from 85° to 89° to the major axis. Slight as this difference may seem, it invokes an entirely different principle of operation. By reason of their right angularity, the ribs of appellants' device are not and cannot be considered screw threads, while it is equally obvious that by their 1° to 5° variation, the projections of appellees' device can be nothing other than interrupted screw threads. Thus, as pointed out in appellees' brief, the purpose of the accused device is to more or less fit the conduit, while the purpose of the patent in suit is to misfit the conduit in affecting the coupling.

*Id.* at 883–84. *See also Hughes Tool Co. v. Varel Mfg. Co.*, 336 F.2d 61, 64–65 (5th Cir. 1964) (holding that a patent, which had been narrowed to avoid further rejection on the basis of prior art, describing an "ovoid or round-shaped" blunt-end drilling bit was not infringed by the accused device which

was a modified design using "multiple, concentric bevels" to produce a blunt-end drilling bit); *Omark Indus., Inc. v. Carlton Co.,* 458 F.Supp. 449, 452–53 (D.Ore.1978), *aff'd,* 636 F.2d 1227 (9th Cir. 1980) (holding that a patent, which had been previously narrowed, for the design of a chain-link saw in which the bumper link and depth gauge were "substantially coextensive" was not infringed by a device in which the bumper link and depth gauge were of different heights); *Compro-Frink Corp. v. Valk Mfg. Co.,* No. 80–2748 slip op. at 29–32 (E.D.Pa. June 15, 1982).

If the facts of this case were found to fit within the rationale of the *D. & H. Electric* decision, defendants' entitlement to summary judgment would then appear to be clearly established. However, it is equally clear that if defendants' device cannot at this point be conclusively regarded as a modification, based in significant respects on prior art, of the Daetwyler device, then summary judgment would be inappropriate.

Of course, before summary judgment may be granted in a patent infringement case, the court must be satisfied that (a) no genuine issue of material fact is present; (b) the technical nature of the patented invention can be fully appreciated without the aid of expert testimony; and (c) the accused device does not contain all the elements set forth in the claims which define the patented device. *See Scharmer v. Carrollton Mfg. Co.,* 525 F.2d 95, 103 (6th Cir. 1975). Further, in considering the motion, the court must view the evidence in the light most favorable to the opposing party and resolve all doubts and inferences in favor of the opponent of the motion. *Harold Friedman, Inc. v. Thorofare Markets, Inc.,* 587 F.2d 127, 131 (3d Cir. 1978). Considering defendants' motion against this standard, I have concluded—despite the significant difficulties for plaintiffs which were discussed earlier—that sufficiently important factual issues remain open and that, therefore, summary judgment is not warranted. To be sure, defendants have marshalled strong arguments in favor of applying the file wrapper estoppel doctrine

in this case. Nonetheless, certain of the factual uncertainties highlighted by plaintiffs involve genuine issues of fact. At this stage of the litigation, it seems apparent that these questions can be resolved only by the fuller exploration of doctor blade technology that a trial would provide. These factual issues include: (a) whether the Benton blade taper is a consistent design feature or the product of vagaries of the chemical etching process used in manufacturing the blade; (b) whether the performance of the Benton blade is significantly distinct from that of the Daetwyler blade and whether any such performance differences are fairly attributable·to differences of design; and (c) the respective ranges of mechanical tolerances involved in manufacturing the Daetwyler blade and the Benton blade. Since I am unable to find that all of these issues can be conclusively resolved in defendants' favor, the motion for summary judgment as to count one of plaintiff's complaint will be denied.

## II.

In the second count of their amended complaint, plaintiffs assert (a) that defendants have advertised the Benton blade as being "more durable" than other doctor blades in order to promote sales of the Benton blade, and (b) that such claims are false or were intended to deceive consumers in the doctor-blade market. Plaintiffs charge that such false representations violate Section 43(a) of the Lanham Trademark Act, which provides in pertinent part:

Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation or origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used,

shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

15 U.S.C. § 1125(a).

■ In general, five principal elements must be shown to establish a Lanham Act claim: (1) that the defendant has made false or misleading statements as to his own product; (2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; (3) that the deception is material in that it is likely to influence purchasing decisions; (4) that the advertised goods travelled in interstate commerce; and (5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc. *See Ragold, Inc. v. Ferrero, U.S.A., Inc.*, 506 F.Supp. 117, 124 (N.D.Ill.1980); *see also American Home Prods. Corp. v. Johnson & Johnson*, 577 F.2d 160, 165–66 (2d Cir. 1978).

■ To support their motion for summary judgment on this count, defendants contend that plaintiffs have failed to come forward with any specific facts showing that defendants' advertising concerning the durability of Benton blades is in any way false or misleading. This argument rests principally on Federal Rule of Civil Procedure 56(e) which provides in part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

In order to rebut plaintiffs' Lanham Act allegations, defendants have also come forward with some affirmative demonstration of the durability of their product. *See* Affidavit of Rufus Benton ¶'s 10–11 (Oct. 21, 1981) (noting that the Benton blade, because of its tapered design, averages 1.5 to 2 million printing cylinder revolutions before replacement as compared with the .5 million revolution lifespan of the Daetwyler blade). Unless this assertion is genuinely placed in doubt by "specific facts" established by affidavits from plaintiffs, then, according to defendants, their motion must be granted.

In response, plaintiffs have filed an affidavit by Peter Daetwyler which recites various instances in which printers have complained that the Benton blade has failed to provide satisfactory print quality over a full printing run. These recitals suggest that the tapered design of the Benton blade may be less satisfactory than the Daetwyler blade because it becomes thicker as the blade wears down and consequently print quality is reduced. *See* Affidavit of Peter Daetwyler ¶'s 13–15 (Feb. 19, 1982). Given a liberal reading, these assertions challenge in some measure the advertising claims by Benton that its doctor blade is "more durable." While the Daetwyler affidavit fails to show that significant numbers of potential purchasers in the relevant market have been misled by the Benton advertising, there are, in my view, enough unresolved issues of fact present in this case to preclude disposition by summary judgment.

Accordingly, defendants' motion for summary judgment on the second count will be denied.