**ALLEN ORGAN COMPANY**

v.

**GALANTI ORGAN BUILDERS INC., et al.**

**Civ. A. No. 89–7636.**

United States District Court, E.D. Pennsylvania.

July 28, 1992.

MEMORANDUM

BARTLE, District Judge.

Plaintiff Allen Organ Company ("Allen") instituted this non-jury action against Defendants General Electro Music Corporation ("GEM USA"), GEM Industry S.p.A. ("GEM Italy"), and Galanti Organ Builders, Inc. ("GOBI"), seeking injunctive and compensatory relief for false advertising pursuant to section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Allen also sought relief based on common law claims of unfair competition, defamation and disparagement.[1] At the time of trial the only remaining defendants were GEM Italy and GEM USA. The following are this Court's findings of facts and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

This Court has subject matter jurisdiction over this action under 15 U.S.C. § 1121 and § 1125 as well as 28 U.S.C. § 1338(b) and § 1331.

Allen is a leading manufacturer and seller of electronic church organs in the United States. GEM USA, an Illinois corporation, is a wholesale distributor of electronic organs. GEM Italy, an Italian company located in Mondaino, Italy, manufactured the electronic organs which GEM USA distributed.

The pipe organ is considered the ultimate in organ sound. However, due to price, many churches and congregations cannot afford one. Allen and other manufacturers of electronic organs produce a less expensive product but strive to reproduce tonal sounds of the classic pipe organs through the use of technology.[2] In 1971, Allen introduced an electronic church organ utilizing digital tone generation, its "digital computer organ." Allen's electronic organs apply digital technology to the tonal

Steven A. Bergstein, Frank, Frank, Penn & Bergstein, Allentown, Pa., for plaintiff.

Daniel P. Hogan, Chicago, Ill., for defendants.

1. At the close of trial, Allen withdrew its disparagement claim.

2. In a pipe organ, the air in the pipe activates a reed which causes the sound. The size of the pipe affects the tuning of the particular sound, while the shape of the pipe determines the sound itself. In a pipe organ, the source of the sound is the wind and an electronic motor is used to activate the wind. The keyboard provides a way for the organist to pick the pitch. Generally, there are 61 keys on manual keyboard, with two manuals on an organ. There are also 32 pedal keys which are operated by the feet of the organist. Therefore, on a pipe organ, there may be at least 61 pipes to correspond to the 61 keys on the manual for each stop, and there may be 25 or more stops. The interaction of keys, stops, and pipes gives the classic pipe organ its rich desirable sound.

production of the organs. In digital tone generation, the sound of one or more of the pipes of a pipe organ is tape recorded. The sound is then converted into digital numbers. The information is fed in the form of binary numbers into the computer memory. When a key of the electronic organ is pressed, the information is retrieved and the sound is emitted. The digital tone generation enables more accurate tonal reproduction of pipe organ sounds than the systems previously used.

GEM Italy likewise manufactured electronic church organs utilizing digital tone generation. It began marketing them, under the name of GEM Organs, in the United States through GEM USA beginning in 1986. After about a year, GEM Italy recruited James Walls, formerly the president of Rodgers Organ Company, to head a separate United States company to market the church organs that GEM Italy had been distributing and marketing through GEM USA. The entity formed was Galanti Organ Builders, Inc. ("GOBI"), incorporated in April 1987. James Walls is GOBI's president and CEO.

In 1987, GOBI began marketing church organs with a "Galanti" nameplate. When GEM USA/GEM Italy first introduced their church organs with digital tone generation in the United States, they made an attempt to differentiate their organs from Allen's on the basis of price. However, for the newly named Galanti models, James Walls altered the marketing, advertising and promotional approach used previously for the GEM models. It is the materials Walls produced and disseminated beginning in 1987 which gave rise to this lawsuit.

The sound in electronic church organs is produced by a process known as "sampling." Allen contends that GOBI falsely described the extent to which the sampling technology was used in producing the Galanti organ sounds.

In sampling, notes are recorded from the ranks and stops of a pipe organ whose sound the manufacturer seeks to emulate, to the extent possible, in an electronic or-

gan. A rank is a row of pipes belonging to one stop on the organ. A stop is a tuned set of organ pipes or reeds of the same specific type and tone quality.[3] The notes of a pipe organ are recorded during the three "stages" of sound: the "attack," when the particular note is first activated; the "sustain," the sound as the note is maintained; and the "decay" or "release," the sound of the organ as the key is released. Samples of the sound, that is, various points along the time interval for which the sound is heard, are used. While many samples of individual notes are recorded, not all the recordings and not even recordings of every note are employed. Through a digital tone generation process, the samples of a few notes provide the basis for the reproduction of the full sound interval of all the notes in the electronic organ.

According to Allen, GOBI, in its brochures and other literature, falsely claimed it recorded samples of every note of every rank from a classic pipe organ and included samples of every note of every rank in the computer memory of its electronic organs. Thus, if there were 61 keys on a manual and there were 25 stops on an organ, the manufacturer would be recording each pipe in the rank of pipes for each stop. If 25 stops were selected by the manufacturer, the note-by-note claim suggests that 1,525 notes were recorded for any one manual, that is 61 keys multiplied by 25 stops, and that the 1,525 recorded notes were incorporated into the electronic organ.

GOBI disseminated information about the Galanti organ through mailers, training materials and brochures sent to dealers and through advertisements. The allegedly false and misleading representations about the sound production methods of the Galanti organ began appearing in 1987. The representations included the following:

(1) [On the Galanti organ,] "Europe's best pipe ranks are recorded note-by-note, with this information stored on a chip, then played back digitally" (Trial Exhibit 1180);

---

**3.** The "stop" is also the lever, pull or switch for putting the set of pipes into or out of operation.

(2) [Galanti organs] "feature the **actual note-by-note recording** of Europe's most notable pipe organs, with this information stored on a chip, then played back digitally to deliver **real pipe sound**" (Trial Exhibit 1181) (emphasis in original);

(3) [Galanti organ features] actual note-by-note recording of Europe's best pipe specimens, stored on a chip, then played back digitally to deliver **perfect pipe sound.** No digital synthesis or analogy tone generating circuitry is employed (Trial Exhibit 1183) (emphasis in original);

(4) [Galanti organ sound is] accomplished by actual note-by-note recording and digital play-back of Europe's best pipe ranks stored on a chip (Trial Exhibit 1186);

(5) "Sampled Wave Processing allows us to derive from selected recordings the information necessary to *faithfully reproduce* the sounds of each pipe organ stop, store that information in memory, and play it back digitally" (Trial Exhibit 1206) (emphasis in the original).

Along with the brochures, mailers, advertisements and training materials containing these "note-by-note" representations, GOBI claimed to be selling the world's first church organ to utilize digital sampling, which it called "Sampled Wave Processing." This "birthright" claim is found in an advertisement in the November 1989 issue of *The American Organist,* and bears the heading "Birthright World's First Digitally–Sampled Organ ... Galanti." (Trial Exhibit 1199). It is Allen's position that although Allen may not have used the term "sampling" in its advertisements and brochures,[4] it used the sampling process in its digital electronic organs long before Galanti entered the U.S. market. In

fact, Allen contended that it developed the process with Rockwell International.

Allen also complained about comparisons Allen believed GOBI was making between the Galanti organs and Allen organs in Galanti dealer manuals. In one manual, GOBI discusses its "engineering system which would enable information to be derived from actual pipe recordings to be encoded on a chip and played back digitally via Galanti's exclusive Sampled Wave Processing technology (not to be confused with ... digital *synthesis*)." (Trial Exhibit 1208) (emphasis in the original). In another document, GOBI stated "they [Allen] still do *not* offer a true sampled waveform system or microprocessor control as does Galanti." (Trial Exhibit 1214).[5]

In addition, Allen alleges a GOBI advertisement contained a statement that implied that the sound produced by a Galanti organ is like the sound of a state of the art compact disc player. GOBI stated that sampled wave processing "is in simple terms a play back system like a compact disk." (Trial Exhibit 1216).[6] Allen argues that this is not only false but also implies that the sound produced by Allen is of lesser quality than that of the Galanti organ.

According to Allen, defendants GEM Italy and GEM USA, through these false statements, comparisons, implications and innuendo, have claimed that Galanti/GEM uses a superior process and technology to produce a higher quality sound compared with Allen organs, and that these misrepresentations were material and intended to, and were likely to, influence purchasing decisions of organ purchasers, in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Those misrepresentations, Allen

---

4. Allen usually referred to its process as computer digital tone generation.

5. Another example appeared in 1987 material where Galanti made the statement that prior to the Galanti organ, the "choices were either digital synthesis (digital computer organ) or analog (microprocessor-controlled analog organ)—both systems showing serious shortcomings...." (Trial Exhibit 1177). Allen asserts this document refers to the Allen organ since Allen called its organs "digital computer organ."

6. Another example is the statement found in a letter from James Walls to a "prospect" (possible customer) in September of 1989 where he writes that Galanti's "new system is not to be confused with other digital attempts to recreate pipe sounds (synthesis). Galanti's system can best be compared to technology used in the latest compact disc players." (Trial Exhibit 1225).

alleges, led to increased sales in Galanti organs and a decrease in Allen sales.

§ 43(a) of the Lanham Act provides:

(a) Any person who, on or in connection with any goods or services, ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or ... false or misleading description of fact, or false or misleading representation of fact, which—

... (2) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). In order to obtain injunctive relief or damages under these provisions, Allen must establish each and every one of the following elements:

(1) that the defendant has made false or misleading statements as to his own product [or another's];

(2) that there is an actual deception or at least a tendency to deceive a substantial portion of the intended audience;

(3) that the deception is material in that it is likely to influence purchasing decisions;

(4) that the advertised goods travelled in interstate commerce; and

(5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of goodwill, etc.

*U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 922–23 (3d Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990), *citing Max Daetwyler Corp. v. Input Graphics, Inc.*, 545 F.Supp. 165, 171 (E.D.Pa.1982).

■ When analyzing a challenged advertisement, it first must be determined what message is conveyed. The advertisement must be considered in its entirety and the context is important in discerning the message conveyed. *Id.*

■ Under the first element of this test, the evidence supports Allen's contention that the note-by-note recording claim was false. Through that statement, GOBI conveyed the message that all notes from each rank for each stop on a famous European pipe organ were recorded individually and all were then computerized and incorporated in the Galanti organs. The evidence demonstrated to this Court that Galanti did not actually record and play back note-by-note. Galanti organs, like Allen's, use samples of some but not all notes recorded from a pipe organ. While none of the ads, brochures, mailers or training manuals may have specifically stated that all 61 notes from the rank for each stop were recorded and embodied in the organs, the terms such as "every note," "all notes," and "note-by-note" used in the advertising and other materials, at the very least, strongly imply that 61 notes per stop were recorded for use in the Galanti electronic organ.

While the Court finds that the note-by-note materials disseminated by Galanti prior to January 1990 do contain false and misleading claims, we do not extend this same finding to documents disseminated after April 1990. As a result of a preliminary injunction hearing on January 22, 1990, GOBI, by agreement with Allen, wrote to all Galanti organ dealers to clarify the misleading statements in GOBI's literature as to its claims about the technology used in the Galanti organ. GOBI was also to take steps to correct the misrepresentations in subsequent literature.

As a result of that agreement, the note-by-note claim as used by GOBI since that time no longer conveys the same message as it did in the earlier advertisements and brochures. For example, a more recent GOBI brochure states, "... we record every pipe of selected ranks for the library of pipe recordings. These recordings are then analyzed and processed. The necessary information, derived from the recordings, is stored in memory ready to be played back digitally." (Trial Exhibit 1206, p. 11). Although Allen still complains about this language, the Court finds that the revision no longer conveys the message that each individual note embodied in the Galanti organ

was recorded from a separate pipe in a pipe organ.

While the pre-April 1990 note-by-note recording claims were false, our analysis does not end there. We must determine whether Allen has satisfied the second and third elements of the *U.S. Healthcare* test:

    (2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; and

    (3) that the deception is material in that it is likely to influence purchasing decisions.

*U.S. Healthcare*, 898 F.2d at 922.

In Lanham Act false advertising cases, courts often examine consumer data to determine the consumer's understanding of the advertisement at issue. *See, e.g., American Home Products Corp. v. Johnson & Johnson, et al.*, 577 F.2d 160, 166 (2d Cir.1978). Here, there was little or no testimony on the impact of the offensive materials directly on the purchasing public. Allen, however, argues that harm could be found without reference to the impact of the advertisements and other materials on the buyer, citing as an example *F.T.C. v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35 (D.C.Cir.1985). In *Brown & Williamson*, the Federal Trade Commission sought to enjoin the defendant from deceptively advertising the tar content of its king-size cigarettes, ads which the FTC claimed were false and deceptive in violation of § 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a). There, the court determined that consumer surveys may arguably constitute the best way to establish consumer understanding, but they were not the exclusive form of probative evidence. The court said a trial court may accord other forms of evidence substantial weight if the evidence appears reliable. *Brown & Williamson*, 778 F.2d at 40–41; and see *Coca–Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312, 316 (2d Cir.1982). Here, Allen has presented only the testimony of Steven Markowitz, President of Allen Organ Company, as to what effect he perceived the false advertising had on consumers, and the testimony of Dr. Edward Mathis, an economist, on the alleged effect on Allen's sales of GOBI's entry into the marketplace. The Court does not find this evidence persuasive on the issue of the effect of the advertising claims on the church organ buying public.

Steven Markowitz, who has been involved for many years in the company founded by his father, testified as to what he found false, offensive and misleading about the GOBI advertising claims. He stated that he was flooded with calls from Allen dealers about the GOBI false advertising claims and the Galanti organ technology and the deleterious effect these ads were having on the Allen prospects. Assuming the admissability of this evidence, Steven Markowitz's conduct as well as the other evidence was inconsistent with any extensive adverse effect of the GOBI advertising claims.

Allen presented no evidence of letters written by dealers on the effect of the GOBI advertising claims during the period of 1987 through September 1990, even though there was evidence that dealers had written letters about the activity of other competitors during this time. Moreover, Mr. Markowitz took no action to stem the flow of the materials from Galanti until July 1988—one *year* after the claims began appearing—when he instructed Mr. Robert Pearce, former Vice President of domestic sales for Allen, to write a letter to James Walls of GOBI expressing dissatisfaction with the claims being promulgated about Galanti organs. (Trial Exhibit 1119). It was not until October 4, 1988, again more than one year after the GOBI entry into the market with the Galanti organ, that Steven Markowitz even addressed the Galanti advertisement in an issue of the Allen Report, a regular newsletter sent by Allen to its dealers. (Trial Exhibit 5006).

Allen presented no convincing evidence of any change in Allen's sales techniques to address the threat posed by GOBI's entry into the market and its advertising claims. In fact, Allen's director of sales, William Kemmler, did not see any change in Allen's sales techniques or tactics to counter the Galanti challenge. (Kemmler Dep., pp. 31–32). This same sales director could not

remember when Galanti entered the market or recall what the false statements in the ads were.

Steven Markowitz's testimony about the threat posed by GOBI's brochures and advertising material was undermined as well by an "Allen Organ Prospect Form," developed in 1989, and disseminated to Allen dealers. The dealer was to complete the form after visiting or calling a prospect and then return it to Allen Organ. On this survey was a heading labelled "Possible Competition," for which Allen provided the following choices:

＿ Pipe

＿ Rodgers

＿ Baldwin

＿ Other—Brand ＿

(Trial Exhibit 5131). While listing Baldwin and Rodgers as competitors, Allen did not list Galanti separately. This "Prospect Form" strongly suggests that Allen did not view Galanti as a serious or major competitor, even as late as July 1989. If Allen really had been concerned about the GOBI competition and had information from dealers that GOBI was causing harm to Allen's sales, as suggested by Steven Markowitz, then Allen surely would have named Galanti, along with Rodgers and Baldwin, on its Allen Organ Prospect Form.[7]

Dr. Mathis, an economist, provided expert testimony for Allen in the form of a series of regression analyses he had done on the effect of the Galanti organ sales and GOBI advertising campaign on Allen sales. His analyses compared Allen's operating income to Galanti sales and Allen's U.S. sales to Galanti sales. He also ran a time series analysis of Allen's operating income, and a time series analysis of U.S. sales of Allen organs. According to Dr. Mathis, for every Galanti organ sold, there was a corresponding decrease in Allen organ sales. While his analyses provided some statistical correlations, Dr. Mathis did not have data available on what was happening in the music industry generally during the relevant time period nor did he have any consumer surveys, market breakdowns or product line breakdowns to consider. Although his analyses considered GOBI's entry into the marketplace, they did not distinguish between the effect of GOBI's entrance into the organ market and the effect of any false advertising claims. The analyses do not conclude whether the decline in Allen sales was merely a result of an additional organ provider in the market place, the result of GOBI false advertising claims, or the result of some other cause. Dr. Mathis' testimony was geared toward explaining the damages allegedly suffered by Allen because of GOBI's entry into the market. His testimony and report did not address the effect of the advertising claims.

Based on the nature of the electronic church organ business, the Court finds more persuasive the evidence presented by defendants that the GOBI advertising and other materials disseminated either (1) would not have a tendency to deceive the intended audience or (2) were not likely to influence purchasing decisions. *U.S. Healthcare*, 898 F.2d at 922–23.

The evidence establishes that electronic church organs in the United States are marketed through a network of local organ dealers who sell organs to the general public. Generally, manufacturers or the

---

**7.** During the same period, Allen was fighting tactics of the Rodgers Organ Company with more vigor. There was evidence that Mr. Pearce, Mr. Kemmler and Steven Markowitz received letters from Allen dealers about Rodgers sales and sales tactics. (Trial Exhibits 5235; 5279; 5196). Jerome Markowitz, former President of Allen Organ Company, in his September 15 and October 14, 1988 newsletters to dealers, commented on the formal policy of terrorism, misinformation, and other deceptive practices he believed Rodgers dealers were using. (Trial Exhibits 5005; 5197). In January, 1989 Allen Organ filed a lawsuit against the Rodgers Company based, in part, on alleged false and misleading statements about Allen products found in Rodgers' training manuals, mailings and other materials. (Allen Organ Complaint, 89–CV–1717 (March 8, 1989)). The timing of these actions demonstrates a vigor by Allen in challenging the Rodgers claims that is not evident in Allen's challenge to Galanti, and these actions weaken Steven Markowitz's statement that the only force affecting Allen Organ's sales was the entry of Galanti into the church organ market and the Galanti advertising and marketing techniques.

wholesale distributors support the dealers by supplying promotional material, advertising, seminars, and other general sales support.

Advertisements do lead to prospects in the church organ market. However, this market is unlike that of a mass market for a consumer item purchased off the shelf, such as dog food or orange juice, where the advertisement alone may sell the product. *See, e.g., ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958 (D.C.Cir.1990), *on remand*, 778 F.Supp. 555 (D.D.C.1991); *Coca–Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312 (2d Cir.1982). The purchase of a church organ is not an impulse purchase; it is a large financial investment with an average life span of thirty years. Prices may range from $10,000 to $40,000 at the "low end" and up to hundreds of thousands of dollars depending upon the features and custom made accessories of the organ.

Dealers generally sell organs to churches through a church committee formed to make the purchasing decision.[8] The dealer or salesman must deal closely with the committee members, through phone calls, meetings and demonstrations. The committee members, for the most part, have no special expertise or knowledge about organs. The sale process may take weeks or months. This once in decades decision to purchase an organ is not made lightly, given the important role of the organ in worship, and the significant sums of money involved. Moreover, a mistake in the purchase of an organ may be the subject of serious adverse comment among parishioners or congregants.

Dealers do not always circulate to potential purchasers the materials describing how the organs work and how the sounds were recorded. (Nelson Dep., p. 113; J. Griffith Dep., p. 89). Dealers, of course, usually are not themselves engineers. For example, when John Nelson, an Allen organ dealer in California, was asked about his technical background, he responded "zero." He had little knowledge of the actual recording process. (Nelson Dep., pp. 111–113). According to Raymond Albright, an installer of Galanti organs, no potential customer ever asked a technical question as to the number of sample points there were per wave.[9] (Albright Dep., p. 103). Mr. Albright also stated "we're not selling technology, we're selling an organ, we're selling sound." (Albright Dep., p. 105). Although the committee members may look at the advertisements, the dealers of organs do not find that it is the technology which sells the product.

Rather, we find that the material factors in the decision to purchase an electronic church organ are the following: confidence in the dealer; rapport with the dealer; dealer's relationship to the community; dealer's relationship to and handling of the committee; the sound of the organ; the price; the look of the organ; and the life span and reliability of the organ.[10]

The evidence presented by Allen was insufficient to support its claim that the church organ purchasing public was deceived by the GOBI note-by-note advertise-

---

**8.** This is the case invariably in Protestant Churches. In Roman Catholic Churches, the Priest may make the decision, with or without the help of a church committee. In The Church of Jesus Christ of Latter–Day Saints (a/k/a "Mormons"), the Church leaders in Utah provide a catalogue of approved organs and other church items, put together by the Church, to the various Mormon churches across the country. The individual churches then choose from among the items in this catalogue and order factory direct from the dealers. The Church leaders determine which organs will be listed in the catalogue by holding a "side by side" every couple of years. At this "side by side," manufacturers bring their organs to the Church leaders and play them. The winners of this "playoff" are chosen by the Church leaders to be featured in the Church's catalogue as approved organs. (Steven Markowitz, Trial Testimony).

**9.** The sample wave form is created when the sample pieces of recordings are connected. The sampling does not record and reproduce the complete sound but takes tiny intervals of the sounds and plots them. The more points (that is, the more samples) taken and used per sound will result in points closer together with less room for error when the time comes to connect the points for the reproduction of the sound.

**10.** This list of factors is derived from testimony both at trial and by deposition of Allen and Galanti dealers and sales people.

ments or that the note-by-note claims had a tendency to deceive a substantial portion of the intended audience. *U.S. Healthcare*, 898 F.2d at 922–23. Even if the note-by-note claims in the GOBI advertisements were actually deceptive or had a tendency to deceive the purchasing public, as is necessary under the second element of the *U.S. Healthcare* test, the evidence was insufficient to prove that the note-by-note claims were "material in that [they were] ... likely to influence the purchasing decisions," as is required under the third element of that same case. *Id.*

While the Birthright claim is false in that Galanti did not develop the process of sampling, the Court finds no violation of the Lanham Act because Allen has not proved by a preponderance of the evidence that the advertisement containing that claim had a tendency to deceive the purchasing public, as is required under the Lanham Act and the *U.S. Healthcare* decision. In any event, any deception that existed was not likely to influence any purchasing decision. The dealers, of both Galanti and Allen organs, generally did not understand the manufacturers' technology. Because the technology is difficult to comprehend, the dealers did not usually discuss the specifics of the technology with the prospects.

The dealer manual comparisons between the Galanti and Allen organs focused largely on the differences between "sampling," which GOBI claims to use, and "synthesis," which GOBI attributes to Allen. GOBI defined "sampling" as a process involving the recording of actual sounds in their natural or common environment and defined "synthesis" as an attempt to duplicate or approximate a sound by using artificially devised, mathematically derived or unnatural wave forms. Allen contends that there is little, if any, distinction between the processes described by the two terms, but that GOBI's use of the term "synthesis" suggests to the public something that is somehow false. However, Allen itself, at some point, referred to its process as "synthesis." (Trial Exhibit 5096). Allen has not proved by a preponderance of the evidence that the comparisons were false or misleading statements for purposes of the Lanham

Act. *See U.S. Healthcare*, 898 F.2d at 922–23.

The Court also finds that the compact disk analogy used by Galanti was not a false and misleading representation. The analogy merely provides individuals with a frame of reference as to the clarity of the sound. It does not imply that the process itself was the same as recording a compact disk. Even if the compact disk analogy were false and misleading, it is not likely to influence purchasing decisions.

Accordingly, this Court finds that Allen has not sustained its burden of proof to recover on its claim under § 43(a) of the Lanham Act. Allen has not proven that any false and misleading materials "[tended] to deceive a substantial portion of the intended audience" or were "material in that [they were] likely to influence purchasing decisions." *U.S. Healthcare*, 898 F.2d 914, 922–23.

Even if Allen had proven by a preponderance of the evidence that the false advertising claims had a tendency to deceive and that any deception was material in violation of the Lanham Act, Allen's case still fails for an additional reason. The defendants here are GEM Italy and GEM USA, the manufacturer and distributor respectively of the Galanti organ. They did not prepare or disseminate the offensive material. Rather, it was GOBI and its president, James Walls, who did so. GOBI settled with Allen prior to trial, and James Walls was not a named defendant.

Allen relies on a joint tortfeasor liability theory for recovery from GEM USA and GEM Italy. Allen alleges that GEM USA and GEM Italy actively participated in the production and dissemination of the offensive GOBI advertising claims, that the defendants lent aid to GOBI in its endeavors, and that the defendants ratified the advertisements, brochures and other materials written by James Walls and disseminated about the Galanti organs. Allen goes so far as to argue that GEM Italy supplied the false claims to GOBI. According to Allen, the acts of GEM USA, GEM Italy, and GOBI were "coordinated, similar, consis-

tent, and indistinguishable." Plaintiff's Memorandum Regarding Joint Tortfeasor Responsibility, p. 4 (citing *C & K Coal Company v. United Mine Workers of America*, 704 F.2d 690, 697 (3d Cir.1983)).[11]

The general definition of joint tortfeasor set out in the Restatement (Second) of Torts is that

Each of two or more persons whose tortious conduct is a legal cause of a single and indivisible harm to the injured party is subject to liability to the injured party for the entire harm.

RESTATEMENT (SECOND) OF TORTS, § 875 (1979).

Under § 876 of the Restatement (Second) of Torts, however, one is not subject to joint tortfeasor liability unless that person:

(a) does a tortious act in concert with the other or pursuant to a common design with him, or

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

RESTATEMENT (SECOND) OF TORTS, § 876 (1979).

In Pennsylvania, the Uniform Contribution Among Tortfeasors Act defines joint tortfeasors as "two or more persons jointly or severally liable in tort for the same injury to persons or property, whether or not judgment has been recovered against all or some of them." 42 Pa.Cons. Stat.Ann. § 8322. Thus, the parties must either act together in committing the wrong or their acts, if independent of each other, must unite in causing a single injury.

*Anderson v. Dreibelbis*, 104 F.R.D. 415, 416 (E.D.Pa.1984) *quoting Lasprogata v. Qualls*, 263 Pa.Super. 174, 178, 397 A.2d 803, 805 (1979).

These joint tortfeasor principles are applicable to Lanham Act claims. *See Max Daetwyler Corp. v. Input Graphics, Inc.*, 541 F.Supp. 115 (E.D.Pa.1982). Allen, however, has not demonstrated the joint tortfeasor liability of GEM Italy and GEM USA. It has not shown by a preponderance of the evidence that GEM Italy or GEM USA knew that the conduct of GOBI or Walls constituted a breach of duty or that the defendants provided substantial assistance to Walls in promulgating and disseminating the claims. Allen has not proved that GEM USA and GEM Italy provided any information with knowledge that it would be incorporated into GOBI's advertising.

Allen introduced testimony that James Walls, president and CEO of GOBI, on his own initiative, had conversations with the Italian engineers working for GEM Italy, but the evidence suggests at most that these engineers explained technical concepts in lay terms and in broken English to James Walls without knowledge of his basis for inquiry. This does not rise to a level of substantial assistance. GEM Italy did not knowingly encourage Walls to use the alleged offensive advertising claims. Walls testified that he wrote and was responsible for all of GOBI's advertisements. (Walls I, p. 51, p. 55). Allen has stipulated that no advertisements or brochures were ever sent from GOBI to GEM Italy for approval. (General Electro Music Corp. (GEM USA) and GEM Industry S.p.A.'s (GEM Italy) Uncontested Facts Nos. 43–45). Also, Walls was receiving information from his multiple sources, including Rodg-

11. Allen provided this Court, in post-trial papers, facts and inferences it contends should be drawn from documents not produced by the defendants prior to trial, based on preclusion orders entered earlier in this case by Magistrate Judge Richard A. Powers and affirmed by Judge Franklin S. Van Antwerpen. These facts and inferences related to the relationships among GOBI, Gem Italy and GEM USA. However, Allen has failed to annotate these findings to specific evidence proffered by the defendants at trial and to specific documents defendants allegedly failed to produce. This Court finds that Allen's proposed facts and inferences are not proper or appropriate facts or inferences to be deemed admitted from the failure of defendants GEM Italy and GEM USA to answer certain interrogatories and to respond to certain requests for documents.

ers' engineers, dealers, Feuder–Rhodes engineers, engineers at Tectronics and Ray Albright—none of whom is a GEM employee. (*See, e.g.,* Walls I, pp. 50–52; p. 80, 1. 24–p. 81, 1. 5; p. 155, 1. 7–24; p. 201, 1. 12–15).

Allen cited two cases in addressing its joint tortfeasor liability theory in the context of unfair competition. Neither case provides sufficient support to sustain Allen's position. In *Smithkline Beckman Corp. v. Pennex Products Company, Inc.,* 103 F.R.D. 539 (E.D.Pa.1984), in allowing a defendant to file a third-party complaint, the court simply recognized that joint tortfeasor principles may be applied to federal and state unfair competition claims, a principle with which this Court does not disagree. It was not addressing an issue of liability. In *Grant Airmass Corp. v. Gaymar Industries, Inc., et al.,* 645 F.Supp. 1507 (S.D.N.Y.1986), the court denied a summary judgment motion of a defendant in a Lanham Act case who was alleged to be a contributory infringer and joint tortfeasor. The defendant, a research firm, not only provided information to the plaintiff's competitor but also was an active player which independently distributed false reports, assisted in the other defendant's sales efforts, and promoted the defendant's products in speeches. 645 F.Supp. at 1512. GEM Italy and GEM USA did not similarly participate with GOBI in the marketing of electronic organs in the United States. In fact, Mr. Amadei, vice president of Marketing for GEM Italy, testified that GEM Italy did not do any advertising for Galanti organs in the United States. We find this testimony credible.

Allen also argues that GEM USA and GEM Italy knew that the advertisements were false, failed to do anything about them, and are, therefore, liable to Allen. In support of this argument, Allen states that Mr. Amadei acknowledged that he had seen and criticized unspecified Galanti organ advertisements. While Mr. Amadei had seen a GOBI brochure at a fair in the past, he criticized it because he did not like pictures of individuals in the brochures. There is no evidence that the brochure contained the "offensive claims," or that he reviewed them, understood them, or knew them to be false.

Allen places great reliance on James Walls' employment contract, in support of its claim that GEM USA controlled GOBI's advertising and marketing. Specifically, Allen relies on the clause providing:

> ... Walls ... shall be responsible for the management and operation of GALANTI [GOBI] during the term of this Agreement, subject only to the advice and consent of the Board of Directors of GALANTI [GOBI], Vittorio Amadei, Matteo Galanti, Daniele Galanti,[12] or such other individuals as are designated from time to time by GALANTI's [GOBI's] Board of Directors.

(Trial Exhibit 3282, clause 2.2). This document when read in its entirety does no more than set out an employment relationship between Walls and GOBI. Walls agreed with GOBI that he would develop business plans, positioning statements, advertising and public relations, product development objectives, pricing strategies, sales trainings, and operating budgets, among other things. Walls also testified through a deposition that GEM was not involved with GOBI's marketing decisions, that Amadei does not approve the hirings and firings of GOBI's employees, and that Amadei does not approve changes in GOBI's sales territories. (Walls II, Confid.Dep., p. 484, 1. 8–23).

Allen also contends that its position that GEM Italy and GEM USA controlled Walls is supported by the provision in the employment agreement that Walls' employment with GOBI was subject to termination should GEM Italy decide not to ship classic organs into the United States. (Trial Exhibit 3282, clause 4.3(d)). This argument is unconvincing. Since GOBI's business is based on the importation of the organs manufactured by GEM Italy, should those organs cease to be shipped into the United

---

12. Vittorio Amadei is GEM Italy's vice president of marketing; Matteo Galanti is GEM Italy's owner and chairman; and Daniele Galanti is the chairman of the board of GOBI as well as a director of GEM USA.

States, there would be no business for GOBI or for James Walls.[13]

Allen claims that GEM Italy hired and paid Walls. Allen has not established who actually paid Walls from February, 1987 when he was recruited through the incorporation of GOBI in April, 1987. Walls testified that he thought he was paid by a draw by GEM Italy through GEM USA up through April, 1987. (Walls I, pp. 8–10). However, Walls testified that he has never been employed by GEM Italy or GEM USA. (Walls II, p. 529, 1. 3–17). Mr. Amadei's testimony at trial was that GEM Italy has never paid any money to Walls. This corroborates Walls' testimony.

One of Allen's final arguments is that GEM Italy and GEM USA are responsible under a theory of contributory infringement for harm to Allen because of GEM Italy and GEM USA's supplying of the organs to GOBI with knowledge that GOBI was violating the Lanham Act by disseminating false claims. Allen cites *Inwood Laboratories v. Ives Laboratories*, 456 U.S. 844, 854, 102 S.Ct. 2182, 2188, 72 L.Ed.2d 606 (1982) for support. The test applied by the court in *Inwood* is "if a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorially responsible for any harm done as a result of the deceit." *Inwood*, 456 U.S. at 854, 102 S.Ct. at 2188. Should *Inwood*, a trademark infringement action under § 32 of the Lanham Act, apply to this false designation claim under § 43(a), this Court finds that Allen has failed to produce sufficient evidence as to either parts of the test. The Court is not convinced that GEM Italy and GEM USA either "intentionally induced" GOBI to produce the offensive claims or that GEM Italy and GEM USA knew or had reason to know of the dissemination of the claims.

Allen's position at oral argument after trial was that its common law unfair competition claim under Pennsylvania law was similar to its Lanham Act claim. Because Allen has not proved a violation of the Lanham Act, its unfair competition claim also falls.

Allen also sought recovery from GEM Italy and GEM USA for defamation. Under Pennsylvania law, a defamatory statement is one that "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *U.S. Healthcare*, 898 F.2d at 923 (citing *Birl v. Philadelphia Elec. Co.*, 402 Pa. 297, 303, 167 A.2d 472 (1960)). In an action for defamation, the plaintiff has the burden of proving (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) an understanding by the reader or listener or its defamatory meaning; (5) an understanding by the reader or listener of an intent by the defendant that the statement refer to the plaintiff; and (6) any special harm resulting from the statement. 42 Pa.Cons.Stat.Ann. § 8343(a)(1)–(6) (1982).

It is for the Court to determine, in the first instance, whether the statement complained of is capable of a defamatory meaning; if the Court decides that it is capable of a defamatory meaning, then it is for the trier of fact to decide if the statement was so understood by the reader or listener. *U.S. Healthcare*, 898 F.2d at 923 (citing *Corabi v. Curtis Publishing Co.*, 441 Pa. 432, 442, 273 A.2d 899 (1971)). The test is the effect the statement is "fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate." *Id.* While GOBI's advertising claims were meant to engender in the minds of the organ buying public that the Galanti organs were high quality

---

**13.** Allen attempted at trial to show that there are no restrictions in the agreement with regard to the reasons GEM Italy may terminate organ shipments to the United States. Allen argued that this provision suggests that should GEM Italy not approve of the ads, it could stop shipment; or that if GOBI utilized unfair market techniques, GEM Italy could stop shipping. If so, this makes GOBI and James Walls subject to control by GEM Italy. Such argument assumes too much and is unsupported by any evidence.

and technologically innovative, Allen has not proven by a preponderance of the evidence that any of the advertising claims tended to lower Allen's reputation in the estimation of the community or to deter other persons from associating with Allen. This Court does not find that GEM USA or GEM Italy made any statements which imputed lack of integrity to Allen in conducting its business. Allen is not entitled to recover on this claim.

The Court will enter judgment in favor of Defendants General Electro Music Corp. and GEM Industry S.p.A. and against Plaintiff Allen Organ Company.